UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Natasha Hawkins, individually and on behalf of all others similarly situated, | 1:23-cv-00700 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| The Coca-Cola Company, | Jury Trial Demanded |
| Defendant | |

Plaintiff alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1. The Coca-Cola Company ("Defendant") manufactures, labels and sells apple juice promoted as "With Vitamin C" which fails to disclose chemical preservatives under the Minute Maid brand ("Product").

 

## I. CONSUMERS VALUE FOODS WITHOUT CHEMICAL PRESERVATIVES

2. Preservatives are ingredients added to food that are capable of and tend to prevent or slow its deterioration.

3. This includes maintaining or improving safety, freshness, nutritional value, taste, texture and appearance.

4. These functions can be achieved through natural preservatives like sugar, salt, vinegar, and spices, or artificial preservatives like ascorbic acid, citric acid, benzoate of soda, salicylic acid, and sulfur dioxide.

5. For over a century, consumers have sought food without chemical preservatives.

6. In response to consumer outcry based on the unregulated environment where dangerous substances were added to the nation's food supply, the Pure Food and Drug Act of 1906 required disclosure of chemical preservatives to inform purchasers about the contents of what they were buying.

7. This requirement was maintained when the Federal Food Drug and Cosmetic Act ("FFDCA") was enacted. 21 C.F.R. § 101.22(a)(5), 21 C.F.R. § 101.22(c).

8. These rules were adopted by every state so all consumers could make informed decisions about the foods they buy.

9. Consumer opposition to preservatives is just as strong today as a hundred years ago, confirmed by research from Nielsen and Mintel indicating that almost ninety percent of Americans are willing to pay more for healthier foods, understood as without synthetic preservatives.

10. That the use of undisclosed chemical preservatives remained prevalent and significant to consumers was affirmed by the International Food Information Council ("IFIC") and Food and Drug Administration's ("FDA") advisory that the public to look at the "Names Found on Product Labels" via the ingredient list for ingredients including "[A]scorbic acid, citric acid

[and] sodium benzoate," among other chemical additives.[1]

11. That reviewing a product's ingredients should be sufficient to tell consumers of the use of chemical preservatives is based on the requirement that "[A] food to which a chemical preservative(s) is added shall [] bear a label declaration stating both the common or usual name of the ingredient(s) and a separate description of its function, e.g., 'preservative', 'to retard spoilage', 'a mold inhibitor', 'to help protect flavor' or 'to promote color retention'." 21 C.F.R. § 101.22(j).

12. The FDA has even warned companies whose products "contain[ed] the chemical preservatives ascorbic acid [and citric acid] but their labels fail[ed] to declare [them] with a description of their functions [and] declared by their common or usual names," which it deemed "misbranding," and thereby capable of misleading consumers.[2]

## II. LABELING IS MISLEADING

13. Neither the front label statement of "With Vitamin C" or "Vitamin C (Ascorbic Acid)" on the ingredient list discloses that it contains the chemical preservative of ascorbic acid.



CONTAINS PURE FILTERED WATER,
CONCENTRATED APPLE JUICE, VITAMIN C
(ASCORBIC ACID).

14. Not only does the ingredient list not inform consumers of the preservative function of ascorbic acid, it identifies it as "Vitamin C," even though its common or usual name is "Ascorbic

---

[1] Overview of Food Ingredients, Additives & Colors, Apr. 2010.
[2] FDA Warning Letter to Chiquita Brands International, Inc. and Fresh Express, Incorporated, Oct. 6, 2010 (relying on 21 C.F.R. § 101.22(j) and 21 C.F.R. § 101.4(a)).

3

Acid."

15. Ascorbic acid is a chemically modified form of vitamin C, used in apple juice as a preservative. 21 C.F.R. § 182.3013; 7 C.F.R. § 205.605(b).

16. While ascorbic acid and vitamin C are authorized synonyms, this is only in the context for listing nutrient information, not in the ingredient list. 21 C.F.R. § 101.9(c)(8)(v).

17. That the ingredient list places "Ascorbic Acid" in parentheses appears a subtle yet insufficient and misleading attempt to comply with the requirements of disclosing a chemical preservative.

18. This is because the only other ingredient types for which parenthetical descriptions are permitted are leavening agents, dough conditioners, and yeast nutrients, and ascorbic acid is not in any of these categories.

19. Consumers are misled because the labeling fails to disclose the presence and function of the chemical preservative of ascorbic acid.

### III. ASCORBIC ACID FUNCTIONS AS PRESERVATIVE

20. Even though apple juice is moderately acidic with a relatively low pH level between 3.35 and 4, the addition of the chemical preservative of ascorbic acid is necessary for multiple reasons relating to preventing and slowing its deterioration.

A. Acidulant

21. Though The Food Additive User's Handbook described ascorbic acid as a "typical acidulant," which enhances apple juice's tart and sweet taste, it is also one of the most commonly used preservatives.

22. Even though the Product is pasteurized, foodborne pathogens can survive pasteurization.

4

23. Ascorbic acid increases the acidity of the Product, lowering its pH, making apple juice less prone to microbial spoilage from bacteria, yeasts, and molds.

24. The low pH of ascorbic acid helps prevent microbial growth in the Product, thereby preventing spoilage and preserving freshness.[3]

25. The addition of ascorbic acid means that if any microorganisms survive, they will be neutralized, so that the Product will be preserved by being stable and consumable for a longer period after it is first made.

B. Chelating Agent

26. Ascorbic acid is a chelating agent in the Product to remove traces of heavy metals.

27. The removal of traces of heavy metals prevents its premature oxidation.

28. This increases the Product's shelf life and helps to maintain its original taste, color and appearance.

C. Microbial Agent

29. Ascorbic acid is an antimicrobial agent in the Product.

30. The addition of ascorbic acid limits the growth and toxin production of molds such as *Aspergillus parasiticus* and *A. versicolor*, which have been shown to exist in apple juice.

D. Buffering Agent

31. Ascorbic acid is as a buffering agent in the Product.

32. A buffering agent helps to maintain a constant pH, preventing batch-to-batch inconsistencies in the Product.

33. Although buffers can be weakly acidic or weakly basic, ascorbic acid is an acidic

---

[3] Kirk-Othmer Food and Feed Technology

buffer.

34. The result of a constant pH is a product which will last longer on the shelf than a product with a variable pH, because it will be more stable and less prone to microbial spoilage.

E. Antioxidant

35. Ascorbic acid is a common antioxidant additive.

36. By definition, antioxidants are oxygen scavengers and prevent oxidation, preserving the Product.

37. Ascorbic acid reverses oxidation of apple juice, preventing the Product from spoiling prematurely, so that it can remain consumable and shelf-stable for a longer period of time after being made.

F. Effects on Color

38. Ascorbic acid prevents discoloration by, among other means, reversing the oxidation of apple juice constituents.

39. For this reason, ascorbic acid is known as an anti-browning agent, preserving the naturally light color of apple juice for a longer period of time after it was first made.

40. The result is that the Product can be successfully sold to consumers for longer periods of time because it remains visually appealing after the point which it would not be in the absence of ascorbic acid.

## Jurisdiction and Venue

41. Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

42. The aggregate amount in controversy exceeds $5 million, including any statutory and punitive damages, exclusive of interest and costs.

43. Plaintiff is a citizen of Illinois.

44. Defendant is a citizen of Delaware and Georgia.

45. The class of persons Plaintiff seek to represent includes persons who are citizens of different states from which Defendant is a citizen.

46. The members of the classes Plaintiff seek to represent are more than 100, because the Product has been sold with the representations described here from thousands of locations including grocery stores, dollar stores, drug stores, convenience stores, big box stores, and/or online, across the States covered by the proposed classes.

47. Venue is in this District with assignment to the Eastern Division because a substantial part of the events or omissions giving rise to these claims occurred in Cook County, including Plaintiff's purchase and use of the Product, reliance on the representations and omissions, and/or subsequent awareness they were false and misleading.

## Parties

48. Plaintiff Natasha Hawkins is a citizen of Chicago, Cook County, Illinois.

49. Defendant The Coca-Cola Company is a Delaware corporation with a principal place of business in Atlanta, Georgia, Fulton County.

50. Defendant owns the Minute Maid brand of fruit juices, one of the most recognized names among juice products.

51. Plaintiff purchased the Product on one or more occasions within the statutes of limitations for each cause of action alleged, at stores within Cook County, between 2021 and 2023, among other times.

52. Plaintiff believed and expected the Product did not contain preservatives because that is what the representations and omissions said and implied, on the front label and the absence of

any reference or statement elsewhere on the packaging.

53. Plaintiff seeks to purchase beverages without chemical additives because she believes these ingredients are potentially harmful, made through unnatural processes with synthetic ingredients, and mean a product is less fresh.

54. Plaintiff relied on the words, terms coloring, descriptions, layout, placement, packaging, tags, and/or images on the Product, on the labeling, statements, omissions, claims, statements, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

55. As a result of the false and misleading representations, the Product is sold at premium price, approximately not less than $2.49 per 15.2 oz (450 mL), excluding tax and sales.

56. Plaintiff bought the Product at or exceeding the above-referenced price.

57. Plaintiff paid more for the Product, would have paid less or not have purchased it had she known the representations and omissions were false and misleading.

58. The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

59. Plaintiff chose between this Product and others represented similarly, but which did not misrepresent or omit their attributes, requirements, instructions, features, and/or components.

60. Plaintiff intends to, seeks to, and will purchase the Product again when she can do so with the assurance its representations are consistent with its abilities, attributes, and/or composition.

61. Plaintiff is unable to rely on the labeling and representations not only of this Product, but other apple juices, because she is unsure whether those representations are truthful.

62. If Defendant's labeling were to be truthful, Plaintiff could rely on the labeling of other brands of apple juice.

Class Allegations

63. Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Illinois Class:** All persons in the State of Illinois who purchased the Product during the statutes of limitations for each cause of action alleged; and
>
> **Consumer Fraud Multi-State Class**: All persons in the States of Utah, South Dakota, Kansas, Mississippi, Arkansas, Alaska, Wyoming and South Carolina who purchased the Product during the statutes of limitations for each cause of action alleged.

64. Common questions of issues, law, and fact predominate and include whether Defendant's representations and omissions were and are misleading and if Plaintiff and class members are entitled to damages.

65. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

66. Plaintiff is an adequate representative because her interests do not conflict with other members.

67. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

68. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

69. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

70. Plaintiff seeks class-wide injunctive relief because the practices continue.

### Illinois Consumer Fraud and Deceptive Business Practices Act
### ("ICFA"), 815 ILCS 505/1, *et seq.*

71. Plaintiff incorporates by reference all preceding paragraphs.

72. Plaintiff purchased the Product and did not expect chemical preservatives, because the packaging failed to disclose this fact.

73. Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### Violation of State Consumer Fraud Acts
### (Consumer Fraud Multi-State Class)

74. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

75. The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

76. Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, which they did, suffering damages.

### Breaches of Express Warranty,
### Implied Warranty of Merchantability/Fitness for a Particular Purpose
### and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

77. The Product was manufactured, identified, marketed, and sold by Defendant and expressly and impliedly warranted to Plaintiff that it did not contain chemical preservatives, because the packaging failed to disclose this fact.

78. Defendant directly marketed the Product to Plaintiff through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail,

product descriptions, and targeted digital advertising.

79. Defendant knew the product attributes that potential customers like Plaintiff were seeking, such as juice without chemical preservatives, and developed its marketing and labeling to directly meet their needs and desires.

80. The representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant it did not contain chemical preservatives, because the packaging failed to disclose this fact.

81. Defendant's representations affirmed and promised that the Product did not contain chemical preservatives, because the packaging failed to disclose this fact.

82. Defendant described the Product so Plaintiff believed that it did not contain chemical preservatives, because the packaging failed to disclose this fact, which became part of the basis of the bargain that it would conform to its affirmations and promises.

83. Defendant had a duty to disclose and/or provide non-deceptive promises, descriptions and marketing of the Product.

84. This duty is based on Defendant's outsized role in the market for fruit juice as custodian of the Minute Maid brand.

85. Plaintiff recently became aware of Defendant's breach of the Product's warranties.

86. Plaintiff provided or provides notice to Defendant, its agents, representatives, retailers, and their employees that it breached the Product's warranties.

87. Defendant received notice and should have been aware of these issues due to complaints by consumers and third-parties, including regulators and competitors, to its main offices and through online forums.

88. The Product did not conform to its affirmations of fact and promises due to

Defendant's actions.

89. The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container, or label, because it was marketed as if it did not contain chemical preservatives, because the packaging failed to disclose this fact.

90. The Product was not merchantable because Defendant had reason to know the particular purpose for which it was bought by Plaintiff, because she expected it did not contain chemical preservatives, because the packaging failed to disclose this fact, and she relied on its skill and judgment to select or furnish such suitable product.

Negligent Misrepresentation

91. Defendant had a duty to truthfully represent the Product, which it breached.

92. This duty was non-delegable, and based on Defendant's position, holding itself out as having special knowledge and experience in this area, the custodian of the Minute Maid brand, consistently rated by Americans as being the most trusted name in juices.

93. Defendant's representations regarding the Product went beyond the specific representations on its packaging and labels, as they incorporated its extra-labeling promises and commitments to quality it has been known for.

94. These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

95. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

96. Plaintiff reasonably and justifiably relied on these negligent misrepresentations and

omissions, which served to induce and did induce, her purchase of the Product.

### Fraud

97. Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it did not contain chemical preservatives, because the packaging failed to disclose this fact,

98. Defendant's attempt at compliance with the disclosure requirements, evinced through labeling "Vitamin C (Ascorbic Acid)" indicate knowledge of what was required when using chemical preservatives but fails to tell purchasers the preservative function of ascorbic acid and/or its classification as a preservative.

99. The records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity or deception, through statement and omission, of the representations.

### Unjust Enrichment

100. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

### Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Certifying Plaintiff as representative and the undersigned as counsel for the classes;
2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;
3. Awarding monetary, statutory and/or punitive damages and interest;
4. Awarding costs and expenses, including reasonable attorney and expert fees; and
5. Other and further relief as the Court deems just and proper.

Dated: February 5, 2023

Respectfully submitted,

/s/ Spencer Sheehan
Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com